UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZEST ANCHORS, LLC d/b/a ZEST
DENTAL SOLUTIONS,

        Plaintiff,

-against-

BIOMET 3i, LLC d/b/a ZIMVIE,

        Defendant.

Case No. 1:23-cv-07232 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

  This case involves a dispute about the alleged use of certain trademarks associated with dental products. Zest Anchors, LLC d/b/a Zest Dental Solutions ("Plaintiff") sues its former distributor, Biomet 3i, LLC d/b/a Zimvie ("Defendant"), for breach of their distribution agreement (the "Distribution Agreement").[1] Dkt. 21 ("Am. Compl." or the "Amended Complaint"). Defendant now moves to dismiss. Dkts. 24 ("Br."), 31 ("Reply"). For the following reasons, Defendant's motion to dismiss is DENIED.

---

[1] The Distribution Agreement is filed under seal at Dkt. 9-1. *See* Dkt. 12 (order granting request to file Distribution Agreement under seal because it "contains sensitive competitive business information" outweighing the presumption of public access). The parties have referred to and quoted certain parts of the Distribution Agreement publicly, and confirmed during oral argument that those aspects of the Distribution Agreement which are critical to the resolution of this motion need not remain under seal. The Court therefore similarly refers to and quotes from the now-public provisions of the Distribution Agreement. However, other provisions of the Distribution Agreement, which are not at issue here, still contain proprietary business information outweighing the presumption of public access and therefore remain under seal at this time.

## BACKGROUND[2]

### I. Factual Background

#### A. Plaintiff's Products

Plaintiff manufactures denture-attachment products, that is, hardware that dentists use to affix removable dentures to patients' jaws. Am. Compl. ¶ 1. Plaintiff's "LOCATOR®" line, which is at issue here, is a suite of denture-attachment products. *Id.* ¶¶ 2, 18. A depiction of the LOCATOR® line is below:



*Id.* ¶ 2.

---

[2] The facts stated herein are taken from the Amended Complaint and accepted as true for the purpose of resolving Defendant's motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010). The Court also considers the Distribution Agreement, which the parties agree is "integral" to the Amended Complaint. *See Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (in considering a Rule 12(b)(6) motion, "district courts may review only a narrow universe of materials, which includes facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken, as well as documents not expressly incorporated by reference in the complaint that are nevertheless 'integral' to the complaint." (brackets, further quotation marks, ellipsis, and citation omitted)); Br. at 10-11 (Defendant asserting that the "Distribution Agreement is integral to the [Amended Complaint]"); Opp. at 5 n.4 (Plaintiff agreeing that the Distribution Agreement is "integral to the Amended Complaint" and therefore "properly before this Court"). Additionally, the Court considers Plaintiff's seven trademark registrations, incorporated by reference into the Second Amended Complaint. Am. Compl. ¶ 24 (identifying Plaintiff's seven trademarks by registration number and features).

The LOCATOR® suite includes four primary components: (1) a LOCATOR® "attachment," which is an anchor fixed to a patient's jaw, and includes a screw-like implant; (2) a gold LOCATOR® "abutment," which is a stud that sits on an attachment and features a triangular design on its top; (3) a round, colored-nylon LOCATOR® "insert," which snaps over an abutment; and (4) a LOCATOR® "housing," which is a metal cap that sits in a denture and holds an insert, thereby permitting the insert to connect the denture and the abutment. *Id.* ¶ 20. The LOCATOR® suite components are depicted below:



*Id.*

The LOCATOR® products come in a range of retention strengths and functions with implants installed at various angles. *Id.* ¶ 22. The color shades of the inserts and the component of the LOCATOR® suite are each associated with a different combination of retention strengths and permissible angulation. *Id.* An example advertisement image featuring Plaintiff's LOCATOR® inserts is below:



*Id.* ¶ 27.

Plaintiff has seven relevant trademarks registered with the U.S. Patent and Trademark Office (the "USPTO") covering the LOCATOR® insert colors. *Id.* ¶ 24; Dkt. 30-2. As an illustrative example, the USPTO trademark registration of one of Plaintiff's federally registered trademarks, bearing Registration Number 4,622,637, is depicted below:





Dkt. 30-2 at 2. Plaintiff's other six USPTO trademark registrations are similar but cover inserts bearing colors other than blue. *Id.* at 4, 6, 8, 10, 12, 14.

### B. The Distribution Agreement

Defendant sells denture attachments and other dental products. Am. Compl. ¶ 29. Defendant distributed Plaintiff's products for many years as an authorized distributor, including by selling Plaintiff's products as part of a collection of dental products that Defendant called

4

"OverdenSURE." *Id.* ¶¶ 29-31, 40. The parties entered into the Distribution Agreement, their most recent distribution agreement, on September 2, 2016. *Id.* ¶ 33. Per the Distribution Agreement, Plaintiff granted to Defendant and its affiliates "a non-exclusive, nontransferable, limited, terminable license . . . to (a) use the Trademarks solely in connection with the advertising and promotion of Products obtained from [Plaintiff] hereunder; and (b) market, distribute and resell packaged Products purchased from [Plaintiff] hereunder." Distribution Agreement § 2.1. The Distribution Agreement defines "Trademarks" as "the marks set forth on Exhibit B" attached to the Distribution Agreement. *Id.* § 1. Exhibit B, in turn, is depicted below:

**Exhibit B**
**Trademarks**

| CHAIRSIDE | LOCATOR | ZEST | RTX |
|---|---|---|---|
| FTX | SATURNO | ZAAG | ZEST ANCHOR |
| LOCATOR RTX | LOCATOR FTX | ZEST DENTAL SOLUTIONS | |
| DURATEC | | | |
| | | ZD ZEST DENTAL SOLUTIONS | |

*Id.* at Ex. B.

5

Section 6.2 of the Distribution Agreement provides that Defendant "will use the Trademarks only in the manner specified by" Plaintiff. *Id.* § 6.2. It further states that Defendant "agrees to apply a proper notation in connection with all uses of the Trademarks in order to acknowledge the proper ownership of the Trademarks. Such notation shall acknowledge that the applicable Trademarks are registered trademark[s] of [Plaintiff] in the form as [Plaintiff] may instruct [Defendant] from time to time." *Id.* Section 6.2 finally provides that Defendant shall ensure that the Trademarks are used in a manner consistent with Plaintiff's trademark usage guidelines and all requirements of applicable laws and regulation. *Id.*

In Section 7.2 of the Distribution Agreement, Plaintiff represented and warranted to Defendant, among other things, that "no third party has asserted and there is no threatened or pending claim" which "challenges the validity of" Plaintiff's interest in the Trademarks. *Id.* § 7.2.

Section 13.5 of the Distribution Agreement provides that, upon termination, "all rights granted to [Defendant] hereunder shall cease and [Defendant] shall refrain from further use of the Trademarks." *Id.* § 13.5. The Distribution Agreement also states in another provision that "[a]ll of the terms and provisions of this Agreement intended to be observed and performed by the parties after the termination hereof, including [Section 13.5,] shall survive such termination and continue thereafter in full force and effect in accordance with their terms." *Id.* § 17.5.

In February 2020, anticipating the expiration of the Distribution Agreement, the parties began to negotiate the terms of a new distribution agreement. Am. Compl. ¶ 41. On August 31, 2021, days before the Distribution Agreement expired, the parties reached an agreement in principle that would have entitled Defendant to discounts on LOCATOR® products in exchange

6

for an exclusivity provision prohibiting Defendant from creating, marketing, or selling products that competed with Plaintiff's LOCATOR® products for a period of five years. *Id.* ¶ 42.

By its terms, the Distribution Agreement terminated on September 2, 2021. Am. Compl. ¶ 6. But after termination of the Distribution Agreement, and "in reliance on" the August 31, 2021 agreement in principle, Plaintiff allowed Defendant to continue marketing and selling its products that were stockpiled in Defendant's inventory on an interim basis. *Id.* ¶ 46.

### C. Defendant's Arrangement with Terrats

While the parties were negotiating terms for a new distribution agreement, Defendant had already "secretly negotiated a separate term sheet with a Spanish company," Terrats Medical Sociedad Limitada ("Terrats"), which manufactures "a knock-off product suite called DESSLoc that not only competes unfairly with LOCATOR® but uses the entire look and feel of the LOCATOR® product suite . . . to do so." *Id*. ¶ 43. Under that arrangement, Terrats would supply Defendant with "knock-off" LOCATOR® products and Defendant would distribute those products. *Id.* ¶ 44. In October 2021, Defendant executed an agreement with Terrats to sell Terrats's DESSLoc product suite. *Id.* ¶ 48.

On December 2, 2021, Plaintiff and Defendant abandoned discussions of a continued distribution agreement. *Id.* ¶ 49.

### D. Defendant's Alleged Breach

After Plaintiff and Defendant failed to reach agreement on a new distribution agreement, Defendant "immediately transitioned to marketing and selling Terrats's DESSLoc knock-offs," using Plaintiff's trademarks. *Id.* ¶ 50. As depicted below, Terrats's products use inserts with colors that purportedly correspond to the same retention strength and angulations as Plaintiff's LOCATOR® inserts:

7



LOCATOR®                                    DESSLoc

*Id.* Defendant began offering the DESSLoc products "as part of the same 'OverdenSURE' collection in which it previously offered [Plaintiff]'s authentic LOCATOR® inserts." *Id.* ¶ 52. Plaintiff alleges that through this offering, Defendant distributed the DESSLoc products by using Plaintiff's trademarks in violation of the terms of the Distribution Agreement. *Id.* ¶¶ 52-55.

## II.   Procedural Background

### A.   The California Action

On February 18, 2022, Plaintiff commenced a trademark, trade-dress, and unfair-competition action against Terrats in the United States District Court for the Southern District of California (the "California Court"), *Zest Anchors, LLC v. Geryon Ventures, LLC*, No. 22-cv-00230 (S.D. Cal.) (the "California Action"). ECF No. 1.[3] Terrats's agent, representative, and distributor in the United States, Geryon Ventures, LLC ("Geryon"), was also named as a defendant in the California Action. *See* Am. Compl. ¶ 51. On March 7, 2022, Plaintiff moved for a preliminary injunction prohibiting Terrats and Geryon (collectively, "DESS") from

---

[3] Citations to the docket in the California Action use "ECF No." while citations to the docket in the present action use "Dkt." The California Action was also brought by "Zest IP Holdings, LLC." Plaintiff represents that "Zest IP Holdings, LLC" is its affiliate. Opp. at 4 n.2. For ease of reference, the Court refers to Plaintiff and Zest IP Holdings, LLC collectively as "Plaintiff" when discussing the California Action.

infringing on Plaintiff's "Insert Color Marks" and the "LOCATOR® Trade Dress."  ECF No. 15.[4]  The California Court granted in part and denied in part Plaintiff's motion, enjoining DESS from "[u]sing in any way, including in connection with the promotion, marketing, advertising, and sale of products or services, [Plaintiff]'s LOCATOR® product suite trade dress or any trade dress that is a colorable imitation thereof, or confusingly similar thereto," and from "[i]mporting into the United States any products that use the LOCATOR® product suite trade dress or trade dress that is a colorable imitation thereof, or confusingly similar thereto."  *Zest Anchors, LLC v. Geryon Ventures, LLC*, 615 F. Supp. 3d 1206, 1243 (S.D. Cal. 2022) ("*Zest I*"), *rev'd in part*, Nos. 22-55704 et al., 2023 WL 2783175 (9th Cir. Apr. 5, 2023) ("*Zest II*").  The California Court did not grant Plaintiff its requested injunction with respect to the Insert Color Marks, concluding that those marks had "utilitarian functionality" and therefore Plaintiff was not likely to succeed on the merits on its trademark infringement claims.  *Id.* at 1232.

While an appeal of *Zest I* was still pending, Defendant moved to intervene in the California Action on August 29, 2022, which the California Court granted on September 23, 2022.  ECF Nos. 69, 80.  Shortly thereafter, Defendant asserted counterclaims against Plaintiff in the California Action, including for declaratory judgment of invalidity of Plaintiff's "Insert Color

---

[4] As relevant in the California Action, Plaintiff's "Color Marks" cover "the use of six specific colors (whether used individually or in groups of three) to denote retention strength without regard to their specific corresponding retention strengths."  *Zest Anchors, LLC v. Geryon Ventures, LLC*, Nos. 22-55704 et al., 2023 WL 2783175, at *1 n.1 (9th Cir. Apr. 5, 2023) (emphasis omitted).  Plaintiff's claimed trade dress in the California Action was "the use of all six specific insert colors in a product suite, with the same colors corresponding to the same retention strengths as in the Trade Dress, along with a gold, trilobate-shaped abutment head."  *Id.* at *2.

Marks" and a petition to cancel the trademark registrations of the "Insert Color Marks." ECF No. 81 at 40-43 ¶¶ 74-80, 87-93.[5]

On April 4, 2023, the Ninth Circuit reversed in part the California Court's preliminary-injunction decision, holding that the California Court "erred in determining that the Color Marks have utilitarian functionality" and ordering the California Court to also assess "aesthetic functionality" on remand. *Zest II*, 2023 WL 2783175, at *2. However, the Ninth Circuit affirmed "the district court's order granting [Plaintiff] a preliminary injunction against DESS's use of the Trade Dress." *Id.*

Shortly after *Zest II*, Plaintiff added a claim against Defendant in the California Action for breach of the Distribution Agreement. Dkt. 150 ¶¶ 160-169. However, on May 25, 2023, Defendant – citing the New York forum-selection clause in Section 17.6 of the Distribution Agreement – demanded that Plaintiff file a separate lawsuit in New York to enforce its rights based on the Distribution Agreement. Am. Compl. ¶¶ 62-63. The present action then commenced, as further detailed below.

On February 2, 2024, Plaintiff, DESS, and Defendant notified the California Court that they had reached settlements in principle with respect to all claims in the California Action. Dkts. 188-189. On April 4, 2024, the California Court dismissed with prejudice all claims in the California Action. Dkt. 195.

---

[5] Defendant also brought counterclaims against Plaintiff in the California Action for declaratory judgment of invalidity of Plaintiff's LOCATOR® trade dress, ECF No. 81 at 41-42 ¶¶ 81-86, declaratory judgment of non-infringement of Plaintiff's Insert Color Marks, *id.* at 43-44 ¶¶ 94-100, declaratory judgment of non-infringement of trade dress, *id.* at 44-45 ¶¶ 101-107, two counts of false advertising based on a press release of Plaintiff's not at issue here, *id.* at 45-47 ¶¶ 108-125, and intentional interference with prospective economic advantage, *id.* at 48 ¶¶ 126-132.

### B. The Present Action

Plaintiff brought this action in New York state court on July 13, 2023, Dkt. 1-1, and Defendant removed the case to this Court on August 15, 2023, Dkt. 1. Defendant filed its first motion to dismiss on August 22, 2023, Dkt. 5, which the Court denied as moot after Plaintiff filed the Amended Complaint, Dkt. 26. Defendant then filed the instant motion to dismiss on September 19, 2023, Br., which Plaintiff opposed on October 17, 2023, Dkt. 29 ("Opp."). Defendant filed a reply in support of its motion on November 7, 2023. Reply. The Court heard oral argument on the motion on August 27, 2024. *See* Dkt. 34.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court accepts as true all non-conclusory allegations of fact and draws all reasonable inferences in the nonmovant's favor. *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc). But a court need not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A pleading must allege "more than a sheer possibility that a [party] has acted unlawfully" and more than "facts that are 'merely consistent with' a [party's] liability." *Id.* (quoting *Twombly*, 550 U.S. at 557). Determining whether a pleading states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[T]he court's task is to assess the legal feasibility of the [allegations]; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

## DISCUSSION

Plaintiff brings two causes of action, both for breach of contract. First, Plaintiff alleges that Defendant breached Section 6.2 of the Distribution Agreement because it did not "use the Trademarks only in the manner specified by" Plaintiff when Defendant used Plaintiff's trademarks to market knock-offs of Plaintiff's products while purporting to negotiate a renewed distribution agreement with Plaintiff. Am. Compl. ¶¶ 64, 67-75. Second, Plaintiff alleges that Defendant breached Section 13.5 of the Distribution Agreement because Defendant continued to use Plaintiff's trademarks to market and sell knock-offs of Plaintiff's products after termination of the Distribution Agreement. *Id.* ¶¶ 76-85. Plaintiff's two breach-of-contract causes of action, therefore, allege breaches that occurred (1) during the course of the Distribution Agreement and (2) after termination of the Distribution Agreement. Defendant moves to dismiss both causes of action.

### I. Applicable Law[6]

There are four elements to a claim for breach of contract under New York law. Those elements are: "[1] the existence of a contract, [2] the plaintiff's performance thereunder, [3] the defendant's breach thereof, and [4] resulting damages." *Russo v. Estée Lauder Corp.*, 856 F. Supp. 2d 437, 460 (E.D.N.Y. 2012) (quoting *Harris v. Seward Park Hous. Corp.*, 913 N.Y.S.2d 161, 162 (1st Dep't 2010)); *accord 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022); *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023).

At the motion-to-dismiss stage, the Court may interpret a contract properly before it, but

---

[6] New York law governs the Distribution Agreement, which contains a New York choice-of-law clause. Distribution Agreement § 17.6. The parties also cite cases applying New York law in their briefs. *See, e.g.*, Br. at 11; Opp. at 12. Under New York choice-of-law rules, such "implied consent" is "sufficient to establish choice of law." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (citation omitted).

must "resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *accord Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 347 (S.D.N.Y. 2013). "Whether contract terms are unambiguous presents 'a question of law that is resolved by reference to the contract alone.'" *Martinez*, 88 F.4th at 409 (quoting *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994)); *see Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011) (a court must assess ambiguity "within the four corners of the document"). "Ambiguity in a contract arises . . . where [the contract's] terms are subject to more than one reasonable interpretation." *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 37 N.E.3d 78, 80 (N.Y. 2015) (quotation marks and citation omitted); *see also Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014).

In interpreting a contractual provision, "courts should consider the entire contract, not isolated words." *W2001Z/15 CPW Realty, LLC v. Lexington Ins. Co.*, 9 N.Y.S.3d 18, 19 (1st Dep't 2015). Courts are to give the "words and phrases in a contract . . . their plain meaning" and construe the contract "so as to give full meaning and effect to all of its provisions." *Chesapeake*, 773 F.3d at 114 (brackets and citation omitted). Finally, "[i]t is axiomatic under New York law . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (brackets, quotation marks, and citation omitted).

II.    **Analysis**

Defendant argues that Plaintiff's two breach-of-contract causes of action "are predicated on [Defendant]'s allegedly improper 'use' of certain 'Trademarks' that are defined and governed by [the] Distribution Agreement," but that Plaintiff fails to "plausibly allege that [Defendant] used these Trademarks." Br. at 1. Defendant asserts that the term "Trademarks" is

13

unambiguously limited to only "those manifestations" or images set forth on Exhibit B, *id.* at 12 (capitalization omitted), and because Plaintiff alleges that Defendant used similar (but not identical) images to "those manifestations," Plaintiff does not and cannot allege that Defendant used Plaintiff's Trademarks in violation of the Distribution Agreement, *id*. at 1-2; *see id.* at 6 ("Nowhere does [Plaintiff] allege that [Defendant] ever used the actual retention insert images or specific colors as 'set forth on Exhibit B.'").

For its part, Plaintiff asserts that the "plain and unambiguous term 'Trademarks,' as used throughout the Distribution Agreement, incorporates the Insert Color Trademarks, *i.e.*, the 'marks' that Zest registered with the USPTO and were depicted in Exhibit B." Opp. at 11. Based on this reading, Plaintiff asserts that it adequately alleged that Defendant used the Trademarks in violation of the Distribution Agreement.

For a defendant to prevail on a motion to dismiss for a breach of contract, the contract must unambiguously support the defendant's position. *See Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 525 (S.D.N.Y. 2021) ("On a motion to dismiss, 'a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous.'" (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016))); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."). Courts are not "'obliged to accept the allegations of the complaint as to how to construe' a contract," but they "'should resolve any contractual ambiguities in favor of the plaintiff' on a motion to dismiss." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)). Motions to dismiss

should be denied where the agreements do not unambiguously support the defendant's interpretation. *See Jackson v. Harvest Cap. Credit Corp.*, No. 17-cv-05276 (JFK), 2018 WL 2041389, at *4 (S.D.N.Y. Apr. 30, 2018) (denying motion to dismiss because "the contractual language is not unambiguous so as to clearly support [the defendant]'s arguments").

That legal standard is decisive here. It is true that the Distribution Agreement granted Defendant rights to use the Trademarks, that the Trademarks shown on Exhibit B contain drawings of the LOCATOR® inserts, and that the Distribution Agreement did not explicitly reference Plaintiff's trademark registrations that protect the colors as applied to the surface of the particular goods. *See* Distribution Agreement at Ex. B; *see generally id*. However, based on its review of the entire Distribution Agreement, the Court does not agree with Defendant that "Trademarks" unambiguously refers *only* to those "manifestations" or drawings set forth on Exhibit B as opposed to also Plaintiff's registered trademark rights. *See W2001Z/15 CPW Realty*, 9 N.Y.S.3d at 19 (courts should consider the entire integrated agreement when interpreting a contractual provision).

First, the rights licensed to Defendant clearly were rights to use trademarks owned by Plaintiff. The Distribution Agreement gave Defendant the right to use Plaintiff's "Trademarks," defined as "the *marks* set forth on Exhibit B." Distribution Agreement § 1 (emphasis added). The term "mark" is a common shortening of the term "trademark." *See, e.g.*, *Kelly-Brown v. Winfrey*, 717 F.3d 295, 304 (2d Cir. 2013) ("[T]he Lanham Act protects *marks* from two kinds of confusion." (emphasis added)); *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005) ("To succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its *mark* is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with

15

plaintiff's mark." (brackets and citation omitted; emphasis added)). Exhibit B is therefore appropriately entitled "Trademarks." *See* Distribution Agreement at Ex. B. Several provisions of the Distribution Agreement refer to Plaintiff's rights and ownership in the Trademarks. *See, e.g., id.* § 6.1 (Defendant "shall not contest [Plaintiff]'s right and title in and to the Trademarks," and "[a]ny and all goodwill arising from [Defendant's] use of the Trademarks shall inure solely to the benefit of" Plaintiff); *id.* § 7.2 (Plaintiff "represents and warrants" that it "owns or holds valid and enforceable rights to use and license" the applicable "intellectual property," including the "Trademarks"). Most importantly, Section 6.2 provides that Defendant "agrees to apply a proper notation in connection with all uses of the Trademarks in order to acknowledge the proper ownership of the Trademarks. Such notation shall acknowledge that the applicable Trademarks are *registered* trademark[s] of [Plaintiff]." *Id.* § 6.2 (emphasis added). Section 6.2 would be rendered surplusage if the "Trademarks" referenced in the Agreement did not include the trademarks "registered" by Plaintiff and instead only referred to drawings on Exhibit B that were not registered by Plaintiff.

Moreover, the recitals of the Distribution Agreement set forth the purpose of that contract – that Plaintiff "desires to grant to [Defendant], and [Defendant] desires to obtain from [Plaintiff] a non-exclusive, non-transferable license to market and distribute the Products, and to purchase from [Plaintiff] the Products." *Id.* at 1. To most effectively carry out that goal, it makes sense that Plaintiff would license to Defendant the right to use its broader registered trademark rights for those trademarks associated with its products, because without being granted such rights, Defendant could not have been a licensed distributor of Plaintiff's products that included its registered Trademarks. In other words, if Plaintiff did not license its registered trademarks to Defendant, but rather just the specific "manifestations on Exhibit B," then

Defendant would have been using Plaintiff's registered trademarks without permission throughout the time that Defendant marketed and sold Plaintiff's products that included its registered trademarks. Such a reading of the Distribution Agreement appears contrary to the parties' intent and is commercially unreasonable. *See Lockheed Martin*, 639 F.3d at 69 ("[T]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." (citation omitted)); *NCCMI, Inc. v. Bersin Props., LLC*, 208 N.Y.S.3d 27, 33 (1st Dep't 2024) ("[A contract should not be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties." (citation omitted)); *Luver Plumbing & Heating, Inc. v. Mo's Plumbing & Heating*, 43 N.Y.S.3d 267, 269 (1st Dep't 2016) (same).

Therefore, at this juncture, the Court finds that the term "Trademarks" is not unambiguously limited to those manifestations or drawings of the colored inserts depicted on Exhibit B. Defendant's sole argument in its motion to dismiss is that the Amended Complaint "does not plausibly allege that the Distribution Agreement prohibits use of any 'Trademarks'" because the term "Trademarks" covers only those manifestations "set forth on Exhibit B." Br. at 16. Because the Distribution Agreement does not "unambiguously foreclose Plaintiff's interpretation," the Court denies Defendant's motion to dismiss. *See Oppenheimer*, 946 F. Supp. 2d at 350; *Orchard Hill*, 830 F.3d at 156 ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."); *Carlton Grp., Ltd. v. Mirabella SG SpA*, No. 16-cv-06649 (LGS), 2017 WL 3530370, at *4-5 (S.D.N.Y. Aug. 16, 2017) (denying motion to dismiss because the agreements did "not unambiguously support [the defendant]'s position"); *Greer v. Mehiel*, No. 15-cv-06119 (AJN), 2017 U.S. Dist. LEXIS 136402, at *17 (S.D.N.Y. Aug. 23, 2017) (holding that "[i]t is enough, for purposes of

17

resolving the motion to dismiss, to hold that the provision does not *unambiguously*" support the defendant's construction).

Defendant asserts in its reply brief that "even if the defined term 'Trademarks' could be read to encompass Zest's trademark registrations, the [Amended Complaint] fails to allege anywhere that [Defendant] has used these trademark registrations." Reply at 6. This argument also fails. As a threshold matter, arguments raised for the first time on reply need not be considered by the Court. *See Shunock v. Apple, Inc.*, --- F. Supp. 3d ----, 2024 WL 3090166, at *11 (S.D.N.Y. June 21, 2024). Moreover, the Amended Complaint does allege, in several places, that Defendant improperly used Plaintiff's trademarks. *See, e.g.*, Am. Compl. ¶ 44 ("[Defendant] used [Plaintiff]'s Insert Color Trademarks to develop its version of Terrats's knock-offs without [Plaintiff]'s knowledge or permission, in breach of its obligation to use the Insert Color Trademarks 'only in the manner specified by [Plaintiff]'"); *id.* ¶ 52 ("[Defendant] began actively using the Insert Color Trademarks by offering Terrats's knock-off LOCATOR® inserts to its substantial audience of denture attachment purchasers"); *id.* ¶ 54 ("[Defendant] distributed these marketing materials to purchasers throughout the United States, using the Insert Color Trademarks to encourage the purchase of [Defendant]'s LOCATOR® knock-offs directedly from [Defendant]'s website").

## CONCLUSION

For all of these reasons, Defendant's motion to dismiss is DENIED. The Clerk of Court is respectfully directed to CLOSE the motion pending at Dkt. 23. By separate order, the Court

will order the parties to appear for an initial pretrial conference.

Dated: August 30, 2024
       New York, New York

                                          SO ORDERED.

                                          *Jennifer Rochon*
                                          JENNIFER L. ROCHON
                                          United States District Judge